IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SENTRY INSURANCE, A MUTUAL COMPANY, | § § § | |
| Plaintiff-counterdefendant, | § § | |
| | § | Civil Action No. 3:04-CV-1043-D |
| VS. | § § | |
| DFW ALLIANCE CORP., et al., | § § | |
| Defendants-counterplaintiffs. | § § | |

MEMORANDUM OPINION
AND ORDER

In this insurance coverage dispute, the dispositive question presented by the parties' cross-motions for summary judgment is whether under the "known loss" doctrine the insurer had a duty to defend its insured in litigation allegedly covered by liability insurance for advertising injury.  Concluding that it did not, the court grants the insurer's motion for summary judgment and denies the insured's cross-motion for partial summary judgment.

I

Plaintiff-counterdefendant Sentry Insurance, A Mutual Company ("Sentry"), sues defendant-counterplaintiff DFW Alliance Corporation ("DFW")[1] seeking a declaratory judgment that it had no

_____

[1]Sentry originally sued BYK, Inc. ("BYK"), and BYK counterclaimed against Sentry.  BYK is now bankrupt.  In view of the bankruptcy, Sentry does not seek relief as to BYK, and the court dismisses BYK's counterclaim without prejudice.

duty to defend[2] DFW in litigation brought by National Diversified Sales, Inc. ("NDS") against DFW and others (the "Underlying Litigation").[3]   DFW counterclaims for declaratory judgment and breach of contract, contending that Sentry had such a duty and breached it by not tendering a defense.

In the Underlying Litigation, NDS alleged that DFW and other affiliated entities and individuals had engaged in unfair competition, infringed patents and trademarks, and breached a contract regarding the patents and trademarks.   NDS specifically averred on information and belief that "prior to [June 30, 2000],"[4] Jim McKinnon ("McKinnon"), Jeff Nielsen ("Nielsen"), BYK, Inc. ("BYK"), and Alliance Marketing and Manufacturing Group, Inc. ("Marketing") had "embarked on a program of subterfuge to prepare themselves to unfairly compete with NDS including, but not limited to, creating molds to manufacture . . . parts, bearing marks and

_____

[2]At least at one point in its motion, Sentry refers to the duty to indemnify.   In most instances, however, it addresses only the duty to defend.   And DFW recognizes in its response to Sentry's motion, and in its own motion, that issues concerning indemnity are not presented by Sentry's or DFW's respective motions.

[3]NDS filed two lawsuits.   The first was filed in California superior court, removed to federal court in California, and then transferred to the Eastern District of Texas, where it was dismissed voluntarily, NDS then refiled the case in Texas state district court.   DFW prevailed against NDS following a jury trial. The court refers to these cases collectively as the Underlying Litigation.

[4]The pleading actually refers to the "Expiration Date," which is a defined term that means June 30, 2000.   *See* P. May 1, 2006 App. 217.

- 2 -

part numbers confusingly similar to NDS's registered trademark 'DFW,' the unregistered mark 'NDS,' [and] the unregistered trademark 'DFW/HPI.'" P. May 1, 2006 App. 218. NDS also asserted that "defendants, with full knowledge of NDS's ownership of the trademarks 'NDS,' 'DFW' and 'DFW/HPI', have manufactured, distributed and sold plastic goods under the name 'DFW' and 'DFW Plastics' . . . since at least as early as January 1, 2001." *Id.* at 221. No later than January 1, 2001 all of the assets of McKinnon, BYK, and Marketing were transferred to defendant DFW. NDS maintained, *inter alia*, that DFW was created as part of an alleged conspiracy to perpetrate a subterfuge to defraud NDS. It alleged that DFW was liable, as a successor-in-interest, for the wrongful conduct of McKinnon, BYK, and Marketing, and that it was entitled to pursue against DFW any claims it may have had against these three entities.

After its formation, DFW obtained two commercial general liability and two umbrella insurance policies from Sentry. The first two⸺a primary policy and an umbrella policy⸺were in force from May 1, 2002 through May 1, 2003. The second two⸺also a primary policy and an umbrella policy⸺were in force from May 1, 2003 through May 1, 2004. All four policies provided coverage for "Advertising injury," P. May 1, 2006 App. 48, but "only if the offense was committed in the 'coverage territory' during the policy period," *id.* The policies define "Advertising injury" as an

injury arising out of one or more of the
following offenses:

a.   Oral or written publication of material
     that slanders or libels a person or
     organization or disparages a person's or
     organization's goods, products or
     services;

b.   Oral or written publication of material
     that violates a person's right of
     privacy;

c.   Misappropriation of advertising ideas or
     style of doing business; or

d.   Infringement of copyright, title or
     slogan.

*Id.* at 57.  The policies contain a "first publication" exclusion

for advertising injuries "[a]rising out of oral or written

publication of material whose first publication took place before

the beginning of the policy period[.]"  *Id.* at 48.

DFW contends that the complaints[5] in the Underlying Litigation

contain allegations that trigger "advertising injury" coverage in

the policies.  Sentry seeks summary judgment declaring that it had

no duty to defend DFW in the Underlying Litigation because the

offenses that gave rise to the claims arose at least as early as

January 1, 2001, and therefore long before the policies went into

force and effect on May 1, 2002.  It relies on the "first

publication" exclusion[6] and the "known loss" doctrine to contend

---

[5]Because the Underlying Litigation involves federal and state
lawsuits, the pleadings are not all referred to as "complaints."
For simplicity, the court will refer to the pleadings as
"complaints" and will use other terms, such as "petition," only
when quoting a case.

[6]Sentry refers to this as the "prior publication" exclusion.
E.g., P. May 1, 2006 Br. 7.  The court will refer to it by the term

that it had no duty to defend.  DFW moves for partial summary judgment establishing that Sentry did have a duty to defend DFW in the Underlying Litigation and that, by failing to do so, it breached the insurance policies and is therefore liable for breach of contract.  Because the cross-motions largely present opposite sides of the same issues, the court will consider them in the context of Sentry's defenses and will then turn to DFW's claim that a favorable jury verdict in the Underlying Litigation has triggered a duty of Sentry to defend DFW.

## II

In Texas "the duty to defend and duty to indemnify are distinct and separate duties creating distinct and separate causes of action." *Am. Alliance Ins. Co. v. Frito-Lay, Inc.*, 788 S.W.2d 152, 153 (Tex. App. 1990, writ dism'd w.o.j.).  The duty to defend is "broader than the duty to indemnify." *E & L Chipping Co. v. Hanover Ins. Co.*, 962 S.W.2d 272, 274 (Tex. App. 1998, no pet.). "The duty to defend arises when a third party sues the insured on allegations that, if taken as true, potentially state a cause of action within the terms of the policy." *St. Paul Guardian Ins. Co. v. Centrum GS Ltd.*, 283 F.3d 709, 713 (5th Cir. 2002) (citation and internal quotation marks omitted).

---

used in the caselaw and in the policies.

- 5 -

> Under the eight-corners or
> complaint-allegation rule, an insurer's duty
> to defend is determined by the third-party
> plaintiff's pleadings, considered in light of
> the policy provisions, without regard to the
> truth or falsity of those allegations. The
> rule takes its name from the fact that only
> two documents are ordinarily relevant to the
> determination of the duty to defend: the
> policy and the pleadings of the third-party
> claimant. Facts outside the pleadings, even
> those easily ascertained, are ordinarily not
> material to the determination and allegations
> against the insured are liberally construed in
> favor of coverage.

*GuideOne Elite Ins. Co. v. Fielder Road Baptist Church*, 197 S.W.3d

305, 308 (Tex. 2006) (citations omitted). Under

> the "eight-corners rule" . . . [i]f the four
> corners of a petition allege facts stating a
> cause of action which potentially falls within
> the four corners of the policy's scope of
> coverage, the insurer has a duty to defend.
> If all the facts alleged in the underlying
> petition fall outside the scope of coverage,
> then there is no duty to defend, but we
> resolve all doubts regarding duty to defend in
> favor of the duty.

*Liberty Mut. Ins. Co. v. Graham*, 473 F.3d 596, 599-600 (5th Cir.

2006). The Texas Supreme Court has rejected the use of

"overlapping [extrinsic] evidence as an exception to the

eight-corners rule because it poses a significant risk of

undermining the insured's ability to defend itself in the

underlying litigation." *GuideOne Elite*, 197 S.W.3d at 309.[7] "A

---

[7]"Mixed" or "overlapping" extrinsic evidence refers to evidence that is relevant both to coverage and liability. *GuideOne Elite*, 197 S.W.3d at 309.

plaintiff's factual allegations that potentially support a covered claim is all that is needed to invoke the insurer's duty to defend . . . ." *Id.* at 310.[8]

### III

The court first considers Sentry's motion for summary judgment.

### A

Under Texas law, "[t]he insurer bears the burden of establishing that one of the policy's limitations or exclusions constitutes an avoidance or affirmative defense to coverage." *State Farm Fire & Cas. Co. v. Blythe,* 2001 WL 1148111, at *3 (N.D. Tex. Sept. 18, 2001) (Fitzwater, J.) (citing Tex. Ins. Code Ann. art. 21.58(b) (Vernon 2001)), *aff'd*, 107 Fed. Appx. 442 (5th Cir. 2004) (per curiam).  When the party who will have the burden of proof at trial concerning an affirmative defense seeks summary judgment on the basis of that defense, it "must establish 'beyond peradventure all of the essential elements of the . . . defense.'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F.Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).  This means that, to obtain summary judgment, Sentry must establish beyond peradventure that it did not have a duty to defend DFW in the

---

[8]Neither Sentry nor DFW relies on extrinsic evidence to support its position concerning whether Sentry had a duty to defend DFW in the Underlying Litigation.

Underlying Litigation, either because of the "first publication" exclusion or the "known loss" doctrine.

B

Sentry maintains that the "first publication" exclusion excuses it from defending DFW because part of the offending conduct began before the policy period.[9]  It argues that, according to the four corners of the underlying pleadings, all the alleged misconduct that gave rise to the "advertising injury" allegedly began around June 2000, or at least as early as January 2001, i.e., almost two years before the first policy took effect.

DFW responds that the only potential allegations that conceivably allege prior infringement in the federal- and state-lawsuits that comprise the Underlying Litigation can be reasonably read to mean that DFW knew of NDS's alleged trademarks as early as January 1, 2001; it is unclear whether NDS alleged that DFW's use of the mark "DFW" was itself a trademark infringement of NDS's trademark "DFW"; Sentry does not allege that DFW made any oral or written publication of material before the beginning of the policy period, as required by the policies; and NDS's pleadings potentially state a claim within coverage and any doubt must be resolved in DFW's favor.  It asserts that even if the court concludes that these allegations refer to "prior publication," they

_____

[9]Sentry does not contest that the Underlying Litigation involves claims that would constitute "advertising injury."

- 8 -

are only raised with respect to NDS's trademark "DFW," and no contentions are made concerning the marks "NDS" and "DFW/HPI," even though NDS also alleged infringement of these marks.  Therefore, NDS's contentions of trademark infringement concerning the marks "NDS" and "DFW/HPI" are separate claims that are within the scope of insurance coverage and not subject to the "first publication" exclusion.

DFW also contends that, under the literal terms of the policies, the "first publication" exclusion does not apply to the type of "advertising injury" at issue in the Underlying Litigation. It reasons that the exclusion only applies to contentions involving slander, libel, or a violation of a person's right of privacy. According to DFW, because the definition of "advertising injury" includes four different offenses, only two of which pertain to the "[o]ral or written publication of material," and because the "first publication" exclusion is restricted to "oral or written publication of material," the exclusion only applies to the two offenses that involve the "[o]ral or written publication of material," i.e., material that slanders, libels, or disparages a person or organization or the person's or organization's goods, products, or services, or that violates a person's right-of-privacy.  DFW maintains that because NDS's claims against DFW are for advertising injury covered by the remaining two offenses that do not involve "oral or written publication of material," the

"first publication" exclusion does not apply.

The court rejects DFW's second argument: that the "first publication" exclusion does not apply to the type of advertising injury at issue. In *Matagorda Ventures, Inc. v. Travelers Lloyds Insurance Co.*, 208 F.Supp.2d 687 (S.D. Tex. 2001) (on motion for reconsideration) ("*Matagorda II*"), Judge Rosenthal of the Southern District of Texas interpreted a similar insurance policy and concluded that the "first publication" exclusion could apply to all four offenses. *Id.* at 689. Concerning the offenses for misappropriation and infringement, she held that "[i]f the misappropriation or infringement does not arise from the publication of oral or written material, it would still fall within the Policy definition of 'advertising injury,' but the first publication exclusion would be irrelevant and inapplicable." But when the alleged misappropriation or infringement *does arise* from the publication of oral or written material, the "first publication" exclusion applies. *See id.* (addressing alleged misappropriation arising from written published material). The court agrees with Judge Rosenthal's conclusion and the cases on which she relies, and it holds that the exclusion applies to all four offenses, including those involving misappropriation or infringement, provided the misappropriation or infringement arises from the publication of oral or written material.

The court must therefore decide whether Sentry has established

- 10 -

beyond peradventure that the claims that NDS brought against DFW and others in the Underlying Litigation are subject to the "first publication" exclusion.  Because Sentry is relying on the third and fourth offenses listed in the definition of "advertising injury," for the exclusion to apply, NDS must have alleged that the misappropriation or infringement arose from the publication of oral or written material.  If Sentry makes that showing, it must also establish beyond peradventure that NDS alleged that its claims arose from material that DFW published before the beginning of the policy period.  Sentry has not made this showing.

NDS alleged that before June 30, 2000, McKinnon, Nielsen, BYK, and Marketing "embarked on a program of subterfuge to prepare themselves to unfairly compete with NDS including, but not limited to, creating molds to manufacture . . . parts, bearing marks and part numbers confusingly similar to NDS's registered trademark 'DFW', the unregistered mark 'NDS', [and] the unregistered trademark 'DFW/HPI[.]'"  P. May 1, 2006 App. 218.  This is the only allegation in the complaint that could link DFW to infringing activity before June 30, 2000.  But this allegation alone does not establish beyond peradventure that DFW "published" infringing materials.  Drawing all inferences in favor of DFW as the summary judgment nonmovant, the averment demonstrates nothing more than preparation for infringement.  Preparation is not the same as publication.  Thus this allegation does not establish beyond

peradventure that DFW published material before the inception of the insurance policies.

NDS also alleged in its complaint that DFW and other defendants, "with full knowledge of NDS's ownership of the trademarks 'NDS', 'DFW' and 'DFW/HPI', have manufactured, distributed and sold plastic goods under the name 'DFW' and 'DFW Plastics' in California, Texas, and other places since at least as early as January 1, 2001." P. May 1, 2006 App. 221. Sentry argues that the caselaw all consistently holds that the "prior publication" exclusion applies to trademark infringement, even though trademark infringement may not involve "publication" in the popular sense of publishing a newspaper or magazine. The court concludes that Sentry's argument is not supported by the cases on which it relies.

None of the cases Sentry cites for this proposition holds that the manufacture, distribution, or sale of infringing products constitutes "publication," as that term is understood in the context of the "first publication" doctrine. In *Matagorda Ventures, Inc. v. Travelers Lloyds Insurance Co.*, 203 F.Supp.2d 704 (S.D. Tex. 2000) ("*Matagorda I*"), *recon. denied*, 208 F.Supp.2d 687 (S.D. Tex. 2001), the infringing material was actually published on a website. *Id.* at 714 ("The placement of this material on the wristwatch.com site is 'written publication of material' within the meaning of the language of the 'first publication' exclusion.").

In *Advance Watch Co. v. Kemper National Insurance Co.*, 878 F. Supp. 1034 (E.D. Mich. 1995), the insured published a sales promotion catalog that contained a picture and description of the infringing item, *id.* at 1043. In *Applied Bolting Technology Products, Inc. v. United States Fidelity & Guaranty Co.*, 942 F. Supp. 1029 (E.D. Pa. 1996), the underlying complaint did not contain an allegation of trademark infringement. *Id.* at 1033-35. Thus none of the cases Sentry cites stands for the proposition that manufacture, distribution, or sale of infringing goods constitutes a "publication." Sentry does not even argue that the manufacture, distribution, or sale of goods under the name "DFW" involved any kind of "publication." And drawing all inferences in favor of DFW as the summary judgment nonmovant, the court cannot say that an allegation that DFW manufactured, distributed, or sold infringing goods establishes beyond peradventure that DFW "published" these goods and therefore falls within the scope of the "first publication" exclusion.

Accordingly, the court concludes that Sentry is not entitled to summary judgment based on the "first publication" exclusion.

C

Sentry argues in the alternative that it had no duty to defend DFW because the underlying claims are excluded under the "known loss" doctrine. It asserts that the wrongful conduct about which NDS complains in the Underlying Litigation occurred long before the

- 13 -

inception of the insurance policies and was known to have begun, thus barring coverage.

DFW responds first on the basis of an argument that it applies both to the "first publication" exclusion and to the "known loss" doctrine.    It  asserts  that  NDS's  contentions  of  trademark infringement concerning the marks "NDS" and "DFW/HPI" are separate claims that are within the scope of insurance coverage and not subject to the "known loss" doctrine.  DFW also contends that the doctrine does not apply to allegations under the Lanham Act because intent is not a required element of a trademark infringement claim, and  even  if  it  does  apply,  there  are  no  contentions  in  the Underlying  Litigation  that  DFW  knew  of  the  alleged  trademark infringements or advertising injuries before coverage took effect. Instead, NDS alleged that on June 19, 2002 its attorney advised DFW and  the  other  defendants  of  its  ownership  of  the  trademarks  and requested that they immediately cease and desist from using them. DFW  argues  that  a  reasonable  interpretation  of  the  pleadings  is that DFW first knew of the alleged trademark infringement when it received  the  attorney's  letter,  which  was  forwarded  during  the coverage period.   It also maintains that NDS may have alleged a prior infringement only regarding the mark "DFW."  DFW asserts that the pleadings may be unclear as to whether NDS contends that DFW committed  a  prior  infringement  of  the  mark  "DFW,"  but  they  are clear that no prior infringements are alleged regarding the marks

"NDS" and "DFW/HPI," and that no knowledge of the prior infringement was alleged or imputed to DFW before NDS's attorney's demand letter in June 2002.

Under the "known loss" or "loss in progress" doctrine, "insurance coverage is precluded where the insured is, or should be, aware of an ongoing progressive loss or known loss at the time the policy is purchased." *Franklin v. Fugro-McClelland (Sw.), Inc.*, 16 F.Supp.2d 732, 734-35 (S.D. Tex. 1997). "The 'loss in progress' principle is recognized as part of standard insurance law." *Id.* "An insured cannot insure against something that has already begun and which is known to have begun." *Id.* (citing *Two Pesos, Inc. v. Gulf Ins. Co.*, 901 S.W.2d 495, 502 (Tex. App. 1995, no writ)). "Texas has long recognized that it is contrary to public policy for an insurance company knowingly to assume a loss occurring prior to its contract." *Two Pesos*, 901 S.W.2d at 501 (citing *Burch v. Commonwealth County Mut. Ins. Co.*, 450 S.W.2d 838, 840-41 (Tex. 1970)).

In support of its "known loss" defense, Sentry cites *Matagorda I* for the proposition that when an individual who is the owner of a later-formed entity was also allegedly involved in earlier ongoing activity, the new entity is considered to have the individual's knowledge that would bar coverage under the "known loss" doctrine. In *Matagorda I* the insured entity, Matagorda, was created as the result of a joint venture agreement whereby

plaintiff Birdsong merged his Internet business, Megasaurus, with another similar company. *Matagorda I*, 203 F.Supp.2d at 706-707. Before the creation of Matagorda, however, and before Matagorda was added to the insurance policy issued by Travelers, Birdsong received a letter from Movado Group accusing Birdsong and Megasaurus of trademark infringement. *Id.* at 707. Movado Group eventually sued the newly-formed entity, Matagorda, for trademark infringement, and Matagorda sought a defense from Travelers. *Id.* at 710-711. Travelers denied the request, and in the ensuing lawsuit, asserted the "first publication" exclusion. *Id.* at 712. Discussing the "known loss" doctrine in connection with the "first publication" exclusion, Judge Rosenthal held that Travelers did not owe Matagorda a duty to defend for trademark infringement that allegedly began before the policy period started. *Id.* at 715-16. She reasoned:

> Matagorda Ventures, through its two owners, Birdsong and Doohaluk, knew when it became insured that it was soon to assume the operation and management of the wristwatch.com site. Movado Group had already sent a demand letter to Birdsong, objecting to the Megasaurus web site's content and threatening legal action. By adding Matagorda Ventures and Birdsong as insureds on the Farmington Policy that Doohaluk had previously obtained for Watch Wholesalers, Inc., and by asking Travelers to provide insurance from the beginning of the Policy period, Matagorda Ventures and Birdsong in effect asked Travelers to provide insurance against a risk known to the additional insureds, but not the insurer. This is precisely the sort of circumstance the "first publication" exclusion

was designed to prevent. The "first
publication" exclusion and the "known loss"
doctrine bar plaintiffs' claims.

*Id.* at 716; *see also Essex Ins. Co. v. Redtail Prods., Inc.*, 1998
WL 812394, at *4 (N.D. Tex. Nov. 12, 1998) (Fitzwater, J.) (holding
insurer owed insured no duty to defend trademark infringement
claim, on grounds of both "first publication" exclusion and "known
loss" doctrine, when demand letter had been received prior to
beginning of policy period), *aff'd*, 213 F.3d 636 (5th Cir. Apr. 12,
2000) (per curiam) (unpublished table decision).

In evaluating whether the "known loss" doctrine applies,
"[t]he relevant inquiry is whether [the insureds] knew at the time
they entered the insurance policy that they were engaging in
activities for which they could possibly be found liable."
*Matagorda I*, 203 F.Supp.2d at 724 (citing *Franklin*, 16 F.Supp.2d at
737). In the complaint in the Underlying Litigation, NDS alleged
that "prior to [June 30, 2000]," McKinnon, Nielsen, BYK, and
Marketing "embarked on a program of subterfuge to prepare
themselves to unfairly compete with NDS including, but not limited
to, creating molds to manufacture . . . parts, bearing marks and
part numbers confusingly similar to NDS's registered trademark
'DFW', the unregistered mark 'NDS', [and] the unregistered
trademark 'DFW/HPI[.]'" P. May 1, 2006 App. 218.[10] Even drawing all

---

[10]The court thus rejects DFW's assertion that NDS's contentions
of trademark infringement concerning the marks "NDS" and "DFW/HPI"
are separate claims that are not subject to the "known loss"

- 17 -

reasonable inferences in favor of DFW, the court holds based on this allegation that the underlying complaint alleges that the infringing activity began before June 2000.  It specifies the activities that allegedly were undertaken, when they started, and who were the actors.  Although the allegation itself does not specifically implicate DFW, NDS also avers that DFW "is not an independent, lawful corporation, but rather is the illegal successor for fraudulent inadequate consideration to the assets of BYK, Marketing and Jim McKinnon, and . . . NDS, as a claimant against BYK and Marketing, is entitled to pursue against [DFW] any claims it may have against BYK, Marketing and Jim McKinnon."  *Id.* at 9.  As in *Matagorda I*, the creation of a new entity does not of itself prevent the underlying plaintiff from alleging a claim for infringing activity that began before the policy period started.

---

doctrine.  DFW argues that the contentions in the "sole paragraph in [NDS's] pleadings which alleges a date prior to the dates of coverage" are only made with regard to the trademark "DFW."  D. Aug. 6, 2006 Resp. 2.  The paragraph (¶ 45 of the federal lawsuit and ¶ 29 of the state lawsuit) to which DFW refers, however, ignores the separate allegation that "prior to the Expiration Date [June 30, 2000]," DFW "embarked on a program of subterfuge to prepare themselves to unfairly compete with NDS including . . . creating molds to manufacture  . . . parts, bearing marks and part numbers confusingly similar to NDS's registered trademark "DFW", the unregistered mark "NDS", [and] the unregistered trademark "DFW/HPI"[.]"  P. May 1, 2006 App. 218.  It is this paragraph on which Sentry bases its "known loss" argument, and this paragraph does not allege that the "program of subterfuge to prepare" for the infringement only applied with respect to the "DFW" trademark.  Rather, it clearly refers to NDS's registered trademark "DFW," the unregistered mark "NDS," and the unregistered trademark "DFW/HPI."  *See id.*

*Matagorda I*, 203 F.Supp.2d at 715.  Although the court must draw all reasonable inferences in favor of DFW, it must also accept the allegations in the underlying complaint as true.  *See, e.g., St. Paul Guardian Ins. Co.*, 283 F.3d at 713 ("The duty to defend arises when a third party sues the insured on allegations that, if taken as true, potentially state a cause of action within the terms of the policy.").  Given this requirement, the court concludes that Sentry has established beyond peradventure that, according to the allegations of the complaint, the infringing activity of BYK, Marketing, and McKinnon that can be attributed to DFW began in June 2000, almost two years before the beginning of the policy period.  Accordingly, the court holds that Sentry has established beyond peradventure that under the "known loss" doctrine, it did not have a duty to defend DFW in the Underlying Litigation.

The court also rejects DFW's contention that the doctrine does not apply to allegations under the Lanham Act because intent is not a required element of a trademark infringement claim.  DFW cites *Finger Furniture Co. v. Travelers Indemnity Co.*, 2002 WL 32113755 (S.D. Tex. Aug. 19, 2002), for this proposition.  In that case, the insurance policy contained a provision that excluded coverage for "advertising injury" "arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity."  *Id.* at *13.  The plaintiff in the underlying action specifically alleged trademark infringement,

dilution, and unfair competition under the Lanham Act. *Id.* at *1. The court held that because the insured could be found liable under the Lanham act even without a finding that it had knowledge of "falsity," coverage was not barred under the insurance policy exclusion. *Id.* at *13. The "known loss" doctrine does not depend, however, on a specific exclusion in the text of an insurance policy. Rather, it is recognized under standard insurance law, and is based on Texas public policy that an insurance company must not knowingly assume a loss that occurs before it enters into its insurance contract. *See Two Pesos*, 901 S.W.2d at 501. Insurers are thus protected against assuming liability for a loss that the insured knew or should have known about before it purchased the insurance policy. Therefore, the allegations of knowledge in the underlying complaint are relevant because they establish knowledge of infringing activity and of potential liability before the inception of the Sentry policy. DFW's Lanham Act-based argument lacks force in this context.

Accordingly, Sentry is entitled to summary judgment declaring that it did not have a duty to defend DFW in the Underlying Litigation because the "known loss" doctrine excused it from that duty.

IV

In addition to seeking partial summary judgment establishing that Sentry had a duty to defend it in the Underlying Litigation——relief that the court has now rejected for the reasons explained above——DFW maintains that Sentry's duty to defend is ongoing and, because the jury in the Underlying Litigation returned a verdict that exonerated DFW from any "first publications" or "known losses," Sentry has a continuing duty to defend DFW from the date of the verdict until the conclusion of the Underlying Litigation.  In its reply brief, DFW concedes that it has been unable to locate case authority for this proposition.  D. Sept. 1, 2006 Reply Br. 7.  It asserts that it proffers this argument "in support of a proposition of law, or extension of law, not yet addressed by the Supreme Court of Texas."  *Id.*  DFW relies on the public policy of the state of Texas and holdings of the Supreme Court of Texas, and it maintains that, once the jury in the underlying case has returned a verdict, the verdict is determinative concerning the ongoing duty to defend from the date of the verdict until the conclusion of the trial.  DFW reasons that, once the jury has decided the facts, "it would be an unjust result to deny a defense by giving preference to self-serving allegations in a pleading" rather than the actual facts, as found by the trier of fact.  *Id.* at 8.

The court's jurisdiction in this case is based on diversity of

citizenship.  As an *Erie* tribunal, the court applies the law as would a Texas court.  *Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938).  Federal courts in *Erie* cases apply existing law or predict what the state's supreme court will do.  They do not enlarge state law on their own initiative.  *See City Pub. Serv. Bd. v. Gen. Elec. Co.*, 947 F.2d 747, 748 (5th Cir. 1991) (opinion denying rehearing) (it is not for court, *Erie*-bound to apply state law as state courts would do, to incorporate innovative theories of recovery into Texas law).

DFW's contention that the court should resolve Sentry's duty to defend based on the jury verdict in the Underlying Litigation is essentially an argument for a new exception to the "eight-corners" rule.  DFW candidly concedes that it cannot cite a single Texas case that suggests that the Supreme Court of Texas would recognize such exception.  Nor does DFW cite a case that provides a basis for this court to predict that the Supreme Court of Texas will do so when the question is presented.  It thus has presented no basis to support an "*Erie* guess" that such an exception to the "eight-corners" doctrine will be adopted.

Because Sentry has established that the "known loss" doctrine excused its duty to defend DFW in the Underlying Litigation, and because DFW has established no basis entitling it to summary judgment in its favor, DFW's motion for partial summary judgment must be denied.

                              *      *      *

     For the reasons set out, the court grants Sentry's May 1, 2006

amended motion for summary judgment and denies DFW's August 2, 2006

motion for partial summary judgment.[11]  By judgment filed today, the

court enters a judgment declaring that Sentry had no duty to defend

DFW in the Underlying Litigation and dismissing DFW's counterclaim

with prejudice.

     **SO ORDERED.**

     February 16, 2007.


                              _____
                              SIDNEY A. FITZWATER
                              UNITED STATES DISTRICT JUDGE

---

[11]DFW's request for oral argument is denied.  *See* N.D. Tex.
Civ. R. 7.1(g) ("Unless otherwise directed by the presiding judge,
oral argument on a motion will not be held.").  After considering
the briefs, the court has determined that oral argument would not
meaningfully assist the decisional process in this case.